1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 1:18-cr-00002-JLT-SKO

12              Plaintiff,                   ORDER DENYING RIVAS GOMEZ'S
                                             MOTION FOR A NEW TRIAL
13        v.
                                             (Doc. 724)
14   ISRAEL ALBERTO RIVAS GOMEZ and
     JOHN DOE aka "MARCOS CASTRO",
15
              Defendants.
16

17

18        On September 23, 2022, after a months-long trial, a jury found Israel Rivas Gomez guilty

19   of kidnapping in aid of racketeering and murder in aid of racketeering in violation of 18 U.S.C. §

20   1959(a)(1).  (Docs. 709–711.)  Rivas Gomez and his co-defendant, Marcos Castro, requested

21   severance of their trials on several occasions both before and during trial, all of which were

22   denied.  After the close of evidence and arguments were submitted, Mr. Rivas Gomez renewed

23   his motion for judgment of acquittal, which was also denied.  (Docs. 694, 717).  Rivas Gomez

24   then filed a Motion for New Trial on the grounds that his trial should have been severed from

25   Castro's.  (Doc. 724.)  For the reasons set forth below, the motion is **DENIED**.

26                            **BACKGROUND**

27        Israel Rivas Gomez and Marcos Castro were tried jointly for the gang-related December

28   2017 kidnapping and murder of victim Abel Rodriguez ("AR").  It is uncontested that Rivas

                                        1

1   Gomez drove the victim to a remote location before stabbing him with a knife and hacking him

2   with a machete along with a group of MS-13 gang members.  Rivas Gomez argued at trial that his

3   purpose in committing these actions was not "to gain entrance to, or to maintain, or to increase

4   position" in the MS-13 gang enterprise.  Despite this argument, a jury convicted Rivas Gomez on

5   all counts, though it failed to come to a verdict as to Castro.  (Docs. 715, 716, 718.)

6        Rivas Gomez now argues that he should be granted a new trial because he suffered

7   extreme prejudice from three "evidential spillover" incidents related to several statements and

8   questions from Castro's counsel at trial.  These incidents specifically concern: (1) a witness's

9   testimony regarding a phone call received prior to the murder; (2) Castro's counsel referring to a

10  particular gathering as a "gang meeting"; and (3) hypotheticals offered by Castro's gang expert,

11  which Rivas Gomez contends "described the Government's theory of [Rivas Gomez's]

12  culpability".  (Doc. 724 at 2–3.)  After a hearing on this Motion, Rivas Gomez submitted

13  additional argument that admission of Castro's statements to law enforcement violated Rivas

14  Gomez' 6th amendment right to confront and cross-examine Castro where his statements may

15  have implicated Rivas Gomez.  (Doc. 742 at 2.)

16  **A.      Witness Testimony of Phone Call**

17       Rivas Gomez first complains of testimony that Castro's counsel elicited from a

18  cooperating witness (hereinafter "CW").  Prior to trial, the government filed a motion in limine

19  seeking to admit evidence of a phone call received by the CW in advance of AR's kidnapping and

20  murder.  According to the government, the CW received the call from a high-ranking MS-13 member

21  who informed the CW that "Rivas Gomez was going to participate in a 'hit' along with other MS-13

22  members so Rivas Gomez could climb the ranks in MS-13." (Doc. 435 at 2.)  The Court intended to

23  hold a Rule 104(c) hearing to determine whether testimony about the call was permissible as a co-

24  conspirator statement, (Doc. 500 at 9), but did not because the government later indicated that it

25  would not broach the topic at trial.

26       Though the government avoided the subject of the call on direct examination of the CW, it

27  ultimately arose when Castro's counsel alluded to the CW's prior knowledge of the murder

28

2

1   during cross examination.[1]  Rivas Gomez's counsel objected to the question, moved to strike, and

2   moved to sever Rivas Gomez's trial from Castro's at sidebar.  (Doc. 638 at 132; Tr. at 261:9–

3   22.)[2]  Rivas Gomez raised specific concern that the CW would disclose knowing that Rivas

4   Gomez would participate in the murder before it happened.  (Doc. 638 at 134; Tr. at 263:4–11.)

5   Castro's counsel subsequently abandoned the line of questioning and broadened his inquiry to the

6   CW's general awareness of gang activities in advance of their occurrence.  (Doc. 638 at 135–36;

7   Tr. at 264–65.)

8           Before continuing with the CW the next day at trial, the government conferred with Rivas

9   Gomez's counsel as to the appropriate redirect questioning regarding the call.  Rivas Gomez's

10   counsel agreed that a Rule 104 admissibility hearing would not be necessary so long as the

11   government did not elicit testimony that Rivas Gomez's name was mentioned in the call to the

12   CW.  (Doc. 639 at 4–5; Tr. at 280–281.)  The government agreed to limit its questioning as such.

13   **B.     "Gang Meeting" References**

14           Rivas Gomez takes issue with Castro's counsel characterizing a particular gathering, at

15   which Rivas Gomez was present, as a "gang meeting."  Throughout trial, the government elicited

16   testimony about and made reference to undercover recorded excerpts of a November 7, 2017,

17   gathering at 1048 Quince Street in Mendota.  As described by Rivas Gomez, the recordings

18   reflected a gathering in which "20-something Salvadoran men, who may have happened to also

19   be gang members, socializing." (Doc. 724 at 2.)  As described by the government, the gathering

20   was a "gang meeting," and the government referred to it as such several times, including in

21   closing statements.

22           Castro's counsel used the "gang meeting" terminology four times.  While examining

23   Rivas Gomez's witness from the Fresno County Sheriff's office, Castro's counsel asked whether

24   the date on a search warrant for Castro's phone was "the same date that Mr. Castro went into this

25   gang meeting with a credit card recorder."  Castro's counsel asked whether the witness was "part

26

27   [1] Specifically, Castro's counsel repeatedly asked the CW if he had "prior knowledge" of the plan to kidnap and murder the victim.  (Doc. 638 at 131–32; Tr. at 260–261.)

28   [2] Where only a portion of a transcript has been docketed, the citation includes first the docket page, then the full transcript page.

3

1    of the surveillance of a gang meeting" in November 2017 when Castro had a recording device.

2    (Doc. 684 at 29–30.)  Rivas Gomez did not object to either of these instances.  Upon examination

3    by the government, the witness later—independently and unprompted by the questioning—stated

4    that 1048 Quince was under surveillance on November 7, 2017 because "there was supposed to

5    be a gang meeting at that residence" and "Marcos Castro was attending that gang meeting."

6    (Doc. 684 at 43:9–21.)

7         Later, while examining Deputy Macias, Castro's counsel asked Deputy Macias about an

8    interaction with Castro that discussed "the incident where Mr. Castro went wired or with a

9    recording device to a gang meeting."  Deputy Macias responded, "to a meeting, correct."  (Doc.

10   687 at 377.)  And finally, during closing arguments, Castro's counsel repeated that Castro

11   attended a "gang meeting" with a recording device on November 7th.  (Doc. 836 at 36; Tr. at 36.)

12   **C.    Expert Hypotheticals**

13        Rivas Gomez also raises concern that some hypotheticals offered by Castro's counsel to

14   Castro's expert witness "described the Government's theory of [Rivas Gomez]'s culpability."

15   (Doc. 724 at 3.)  Specifically, Rivas Gomez took issue with a hypothetical implying that anyone

16   invited to remain present for AR's murder was of a higher rank than someone—like Castro—who

17   was asked to leave before the murder took place.  (Doc. 685 at 50.)

18                              **LEGAL STANDARD**

19        Under Federal Rule of Criminal Procedure 33(a), a "court may vacate any judgment and

20   grant a new trial if the interest of justice so requires."  In evaluating a motion for a new trial under

21   Rule 33, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict,

22   and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses."  *Id.*

23   The burden of justifying a new trial, rests with the defendant, *United States v. Endicott*, 869 F.2d

24   452, 454 (9th Cir. 1989), and "[a] motion for new trial is directed to the discretion of the judge,"

25   *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).  *Accord United States v. Kellington*,

26   217 F.3d 1084, 1097 (9th Cir. 2000) (district court's decision to grant or deny a new trial is

27   reviewed for abuse of discretion).  Though the burden on a motion for new trial is not as

28   demanding as that for a motion for acquittal, such motions are generally disfavored and should

                                         4

1    only be granted in exceptional cases.  *See United States v. Del Toro–Barboza*, 673 F.3d 1136,

2    1153 (9th Cir. 2012).  Where evidentiary spillover is at issue, the court should not grant a new

3    trial based on prejudicial spillover unless the defendant proves "prejudice so pervasive that a

4    miscarriage of justice looms."  *United States v. Katakis*, 252 F. Supp. 3d 988, 992 (E.D. Cal.

5    2017), *aff'd*, 796 F. App'x 400 (9th Cir. 2020) (citing *United States v. Lazarenko*, 564 F.3d 1026,

6    1043 (9th Cir. 2009)).

7                                              **ANALYSIS**

8            Rivas Gomez argues that these incidents were prejudicial to him, would not have occurred

9    if his motions to sever his trial from Castro's had been granted, and ultimately justify a new trial.

10   Rivas Gomez's argument fails because he fails to demonstrate that these events caused him

11   "exceptional" prejudice.

12   **A.     Rivas Gomez's Allegations of Prejudice are Insufficient**

13           As an initial matter, Rivas Gomez's claims of prejudice are vague and largely

14   unsubstantiated.  In his motion, Rivas Gomez claims that the three "spillover" incidents

15   "prejudiced him before the jury, and led to their guilty verdicts for him."  (Doc. 724 at 4.)  This

16   claim ignores the litany of other evidence presented during the trial from which the jury could

17   reasonably find Rivas Gomez guilty of the counts charged.  As discussed in this Court's prior

18   order denying Rivas Gomez's renewed motion for judgment of acquittal, evidence aside from the

19   "spillover" incidents supported the government's allegations that Rivas Gomez "had been a

20   member of the gang for at least one year . . . attended meetings of the gang, had indicia of

21   membership in his personal possessions in his home . . . [and] frequented gang hangouts and

22   socialized with known gang members."  (Doc. 717 at 3.)

23           Rivas Gomez further claims that the "phone call" evidence elicited from the CW "may

24   have been for the jurors the strongest evidence against [him] on the element of whether his

25   presence" at the murder "was motivated to join, maintain, or increase his position in the gang."

26   (Doc. 724 at 7.)  Such speculation does not rise to the level of "extraordinary" prejudice,

27   particularly where the totality of the CW's testimony was merely that "someone" from Rivas

28   Gomez's MS-13 clique would participate in a forthcoming murder along with two other cliques,

                                                    5

(Doc. 737-2 at 335); and testimony *prior* to the introduction of the phone call demonstrated that Rivas Gomez was told directly that he could advance in the gang if he killed someone.  (Doc. 637 at 71.)

**B.      "Gang Meeting" References and Expert Hypotheticals as Antagonistic Defenses**

Rivas Gomez has not demonstrated sufficient prejudice from the "gang meeting" characterization and hypotheticals provided to Castro's expert, both of which appear to be concerns about antagonistic defenses.  The motion for new trial describes these instances as Castro's counsel "effectively representing his client" in a way that "helped Castro with his different defenses, while prejudicing [Rivas Gomez]."  The motion further describes the expert hypotheticals as "designed to help Castro at [Rivas Gomez]'s expense." (Doc. 724 at 6.)  Though a portion of Castro's defense strategy was peripherally inconsistent to Rivas Gomez's, this level of inconsistency is not sufficiently prejudicial to require a new trial.

"Mere inconsistency in defense positions is insufficient to find codefendants' defenses antagonistic," *United States v. Tootick*, 952 F.2d 1078, 1080 (9th Cir. 1991), as is "the desire of one defendant to exculpate himself by inculpating a codefendant."  *Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996).  Defendants with antagonistic defenses are only entitled to severance when "the core of the codefendant's defense is so irreconcilable with the defendant's own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." *United States v. Throckmorton*, 87 F.3d at 1069–72 (citing *United States v. Sherlock*, 962 F.2d 1349, 1363 (9th Cir. 1989), *cert. denied sub nom. Charley v. United States*, 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992)).  Castro's defense that he was a lower-ranked gang member than those, like Rivas Gomez who participated in the physical killing of AR, is not so irreconcilable with Rivas Gomez's defense that acceptance of the former precludes acceptance of the latter.

**C.      Evidence Admissible in a Standalone Trial**

Rivas Gomez cannot demonstrate compelling prejudice from the testimony regarding the CW's phone call because that evidence would be admissible against Rivas Gomez in a standalone trial.  The Ninth Circuit has examined prejudice from spillover evidence in joint trials and

1    concluded that prejudice is not present where the spillover evidence (1) would have been

2    admitted in separate trials, (2) was inconsequential in the grand scheme of things, or (3) was

3    rendered non-prejudicial through sufficient limiting instructions. *United States v. Johnson*, 297

4    F.3d 845, 855–56 (9th Cir. 2002).  Though *Johnson* examined prejudice in the context of

5    appealing a district court's denial of severance, its analysis is informative here.  Other circuits

6    have reached similar conclusions.

7        In *United States v. Dzhanikyan* for example, the First Circuit rejected the defendant's

8    argument that evidence of his codefendant's drug dealing required severance and a new trial

9    where, even if the case was severed, "the jury still would have been exposed to evidence about

10   [the] drug distribution conspiracy." 808 F.3d 97, 102–03 (1st Cir. 2015).  In this circumstance, the

11   defendant could not show that the evidence against his co-defendant "created the kind of 'serious'

12   risk of prejudice" that required the district court to sever the case and order a new trial.  *Id*. at 103

13   (quoting *United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993).)

14       Rivas Gomez does not quibble with this applicable law but argues in his reply that the

15   CW's phone call testimony would not be admissible against him in a standalone trial because "the

16   Government was not going to present CW's testimony on this" and only did so because Castro's

17   counsel opened the door.  (Doc. 733 at 2.)  This is further speculation on Rivas Gomez's part.

18   Whether the government planned to introduce the details of the CW's phone call in the joint trial

19   has no bearing on whether the testimony would be *admissible* against Rivas Gomez in a

20   standalone proceeding.

21       As discussed in the Court's prior order regarding this testimony, the CW's testimony

22   about the phone call at issue would be admissible as a co-conspirator statement if the government

23   demonstrated by a preponderance of the evidence that (1) a conspiracy existed when the

24   statement was made; (2) both the declarant and the defendant against whom the statement is

25   offered were members of that conspiracy; and (3) the statement was made during the course of,

26   and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).[3]

27

28   ---

[3] In making a factual determination of the admissibility of co-conspirator statements under this rule, the Court may consider the statements themselves as well as any other independent evidence of the conspiracy. *Bourjaily*, 483 U.S. at 180-81; *see* Fed. R. Evid. 104(a).  "[T]he court is not bound by evidence rules." Fed. R. Evid. 104(a).  Also, the

Here, the first two *Bourjaily* factors are met by a preponderance of the evidence. No party contests the existence of the MS-13 conspiracy at the time of the phone call, and there is ample evidence that Rivas Gomez was a member of the MS-13 conspiracy. Though Rivas Gomez has previously questioned the timing of the call, evidence and testimony submitted at trial support that the statement was made during the course of and in furtherance of the conspiracy by a preponderance of the evidence. As such, testimony about the call would be admissible against Rivas Gomez in a standalone trial, and he cannot demonstrate prejudice from the CW call in the joint trial. Further, as discussed above, the CW call was but one of many pieces of evidence implicating Rivas Gomez in the charged crimes.

**D.    Confrontation**

After a hearing on this Motion, Rivas Gomez submitted additional briefing and argued that his Sixth Amendment right to confront Castro was violated in the course of the joint trial. This is because, according to Rivas Gomez, "the jury heard Mr. Castro made certain statements to law enforcement which can be interpreted as implicating [Rivas Gomez] in the charged conduct . . . and/or provide evidence of gang membership," but Rivas Gomez could not confront Castro as to these statements because Castro did not testify at trial. (Doc. 742 at 2.)

In support of this argument, Rivas Gomez noted that the Supreme Court recently granted certiorari in *Samia v. United States*, a Second Circuit case in which a defendant's redacted statement to authorities clearly implicated his co-defendant as the gunman in a murder-for-hire scheme. Though the *Samia* defendant's redacted statement referred to the "other person" who pulled the trigger, the government described the statement as some of the "most crucial" evidence that would prove the co-defendant's guilt in a joint trial. *See* Petition for Writ of Certiorari, *Samia v. United States*, 2022 WL 4010126. The *Samia* petitioner appealed to the Supreme Court to solve a circuit split in which the First, Third, Seventh, Ninth, Eleventh, and District of Columbia Circuits have held that redacted confessions must be considered in context with the

---

Confrontation Clause does not require the court to make an inquiry into the independent indicia of the reliability of the statement. *Bourjaily*, 483 U.S. at 182; *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005) ("[C]o-conspirator statements are not testimonial and therefore beyond the compass of *Crawford*'s holding.")

1  other evidence to determine if they implicate a co-defendant, while the Second, Fourth, Eighth,

2  and Tenth Circuits view redacted confessions in isolation when considering their impact on Sixth

3  Amendment rights.  *Id*.

4  It is unclear how the grant of certiorari in *Samia* would affect the instant Motion.  First,

5  the facts in this case are different: Rivas Gomez does not complain that Castro's statements

6  implicated him specifically. Instead, Rivas Gomez complains that several of Castro's statements

7  referred to "other gang members" who met Castro at a remote location and "the others" who

8  arrived and discussed what would happen to AR after Castro left the scene.  (Doc. 742 at 2–4.)

9  Castro also used the pronoun "they" when describing some group members who were present or

10  gave instructions without specifying who "they" referred to.  (Doc. 742 at 4.)  Indeed, at trial

11  Castro's statement was redacted—without objection by Rivas-Gomez—to indicate that while AR

12  was being held in the car at the canal bank, "Molesto" telephoned "Little Whisper" and

13  "Pilancho," despite that Castro's true statement was that Molesto had also called "Pirra"—the

14  nickname used by Rivas-Gomez. This is despite the fact that Rivas-Gomez admitted in his

15  statement to the police that he had driven Little Whisper and Pilancho to the canal bank.

16  Also, as the government notes, Castro's statement indicated that "they" talked at the canal

17  bank what "they" were going to do with AR. This was consistent with the statement Rivas-

18  Gomez gave to police in which he reported that Molesto and Little Whisper were threatening

19  A.R. at the canal bank. For the same reason, Castro's admission of what he thought was going to

20  happen to A.R. after Castro left the canal bank pales in terms of its incriminating value when

21  compared to Rivas-Gomez's statement to police that the group took AR to the remote area where

22  they murdered him.

23  Different from the statements in *Samia*—where the redactions made clear that they the co-

24  defendant's statements referred to a particular person—Rivas Gomez complains that Castro's

25  statements were so unclear as to who they implicated, that the jury *could* interpret that Rivas

26  Gomez was among the group that Castro described to law enforcement.  (*Id*.)  Exactly how

27  reliance on *Samia* helps Rivas-Gomez on this point is unclear. In any event, Rivas Gomez fails to

28  explain how the statements so substantially violated his Sixth Amendment rights given the fact

9

1   that he corroborated these statements with his own admissions to the police.[4]

2          Second, unlike the Second Circuit in *Samia*, the Ninth Circuit already uses the more

3   defendant-friendly test when evaluating whether admitting non-testifying co-defendant's

4   statements to law enforcement violates another defendant's Sixth Amendment Confrontation

5   Clause rights.  In *Mayfield*, for example, the Ninth Circuit held that the context surrounding a

6   defendant's statement may impermissibly implicate a co-defendant such that his Sixth

7   Amendment confrontation rights are violated.  *United States v. Mayfield*, 189 F.3d 895 (9th Cir.

8   1999).  There, the redacted confession created an inference that was "unavoidable . . . in the

9   context of the previously admitted evidence at trial."  *Id*. at 902.  The confession at issue in

10  *Mayfield* referred to "the main man" after jurors already heard improper evidence that the co-

11  defendant was a "primary suspect."  *Ibid*.  Importantly, the statement in *Mayfield* had one

12  defendant "pointing an accusatory finger at someone and it was not difficult for the jury to

13  determine that that person was the other defendant on trial."  *Id*. at 902.  Castro's statements,

14  being particularly vague as to who they referenced, do not appear to implicate the Sixth

15  Amendment issues described in *Mayfield*, particularly where it is uncontested that Rivas Gomez

16  was present at and participated in AR's murder.

17         Most importantly is the fact that, though Rivas Gomez represented at the hearing that he

18  did not want to argue "the Confrontation issue," that is exactly what his supplemental briefing

19  does—without citing or discussing the applicable standard for non-testifying co-defendant

20  statements in this Circuit or providing argument as to how Castro's statements violated Rivas

21  Gomez's rights under the current standard.  On this record, Rivas Gomez has not met his burden

22  to demonstrate that he was prejudiced by Castro's admitted statements to law enforcement which

23  do not name Rivas Gomez and do not clearly implicate him specifically even when considered

24  with other evidence.

25  ///

26  ///

27
    _____

28  [4] The Court agrees with the government also that the fact that Castro reported about how AR was
    captured—specifically that Molesto alone captured AR—does not implicate Rivas-Gomez in the initial act
    of kidnapping and, consequently, does not implicate his Sixth Amendment rights.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For these reasons, Rivas Gomez's motion for new trial (Doc. 724) is **DENIED** in its entirety.

IT IS SO ORDERED.

Dated:   __**January 23, 2023**__

UNITED STATES DISTRICT JUDGE

11